Thank you. Good morning, Your Honors. Peter Shea, appearing for the Plaintiff Appellant. May it please the Court. There appear to be three principal cases that focus on the Glenmore type of exemption that was raised in this case. Before moving on to other subjects, I want to just briefly review those cases because I think they all stand in sharp contrast to this particular case. The first case was the Glenmore case itself, which is actually called Filippi v. CIA, but it's cited throughout the briefs. It's a 1976 case by the D.C. Circuit. In that case, it appears for the first time, the Court permitted this type of response where the agency would neither admit nor deny even the existence of the records because the records that were sought were about a ship that was conducting, supposedly it was a research ship. It appears it was owned by a Howard Hughes Corporation, but there were news reports that it was actually a CIA ship. And by seeking information about the contracts between the CIA and this corporation, the Sumac Corporation, and the personalities involved, the agency, the CIA, argued, and the Court agreed with fairly logically, that by simply disclosing whether such records existed or not, you'd basically be answering the underlying question, was this ship really a CIA operation or not, and who was involved in its functioning? That approach was adopted by two cases in this circuit in 1992, and again I think in 1996, in the Hunt case and in the Minear case, M-I-N-I-E-R. But again, in both of those cases, what was sought from the CIA were documents that would actually show the relationship between the CIA and a particular individual. In the Hunt case, the individual was a dead individual, the person seeking the information was charged with his murder, but he was an Iranian national who this defendant claimed was a CIA operative, a CIA agent of some type, and he filed a Freedom of Information Act request to seek any information about the relationship between that individual and the CIA. And similarly, in the Minear case, the requesting party sought information about an individual who allegedly working for the CIA and was allegedly involved in the assassination of President Kennedy. And in both of those cases, this circuit followed the Glomar case, and it makes perfect sense to me and I think to pretty much other courts that have adopted this position, that to disclose the relationship between the CIA or the existence of such documents, or the non-existence of such documents, would basically answer the underlying question, did this person have some sort of a clandestine relationship with the CIA? And that information is clearly not subject to disclosure under laws that are incorporated into the Title 50 of the United States Code, Section 403, that are incorporated into the Freedom of Information Act. That law says that the CIA, and I think it predates the Freedom of Information Act, says that the CIA and other intelligence agencies are not required to disclose the identities of people that work for them or their sources or the functions that those people play. So we don't have any argument with those cases. Those cases seem to make sense. This case is different. In this case, it truly appears to us, and it's possible we missed something, although we've obviously researched this fairly carefully, it truly appears to us that this is the first case in which the NGA, in which a request for either images or of any documents about those images to the NGA, has come to any court of appeals in the United States, and more importantly is unique in this sense and is important in this sense, that it's the first, this case represents the first time that we can tell, maybe we're wrong, clerks will prove us wrong, but I don't believe we're wrong, this is the first time that an intelligence agency has ever taken the position, and this is a relatively new agency, the CIA and the Defense Intelligence Agency, these other agencies have been around a lot longer and have been dealing with the Freedom of Information Act a lot longer, this appears to us to be the very first time, not only that an NGA case has come before the court of appeals, but the first time that an agency has taken the position, as they take in this case, that they will assert a Glomar exemption to every FOIA request, period and end of story. They don't say, oh, it's this particular request, it's the nature of this request, it's the nature of the images that are being sought here, it's the age or the lack of age, it's the resolution of the images, or anything about the documents that we seek about the images, they say period, end of story, any request. Right, and they say this is the nature of our mission, is to, everybody knows we're taking pictures. That's correct. What they don't know is where we're focusing, what kind of thing we're directing our attention, how high the resolution is, and to reveal anything beyond the fact that there are pictures out there of something, which is a fact we can't deny. We wish we could, but we can't deny that fact. Any further information would give away part of our mission. That is what they say. That's their argument. That is what they say. If you like the CIA coming to you, why didn't the CIA adopt that position 25 years ago, and take that position in every single FOIA case? Maybe that's part of the CIA. Maybe they will if you rule in favor of the CIA. But you look at all these cases for 25 years, and the CIA could just say, well, everybody knows we gather foreign intelligence, but you know what, if we answer this FOIA, we'd somehow be confirming that we gather foreign intelligence. Everybody knows the CIA gathers foreign intelligence everywhere in the world, especially hot spots. So they would be saying, oh, but if we told you that we gathered foreign intelligence in Europe, we'd be telling you something the world doesn't know. Everybody, and in these cases... We don't know that. We have this kind of standoff you have, I guess it's Mr. Barlow,  is classified, because to reveal that we're pinpointing or targeting particular places is national security. Then we have your experts' affidavits say, well, we don't believe that's the case. We believe they could turn it over with no national security implication. Although they don't really tell you why, except to say, well, it's some years ago, and we think if there's any diplomatic problem, it already would have hit the fan. But that hardly trumps the view that the national security, that there's a significant national security interest, does it? I mean, it seems to me that they've made that statement because of the nature of their monitoring, and they're saying that not only that could be reverse engineering, there could be targeting of their monitoring. So what is the response to that? Yeah, I think there's several responses. One response is, of course, at this time, I wish we were further along, and we were arguing about actual production of the documents, but at this time there is no argument about the production of documents. It's just, do they exist? And it's not just the images. It's also documents about the images. The second response is, so in a sense, you raise interesting questions, but if this case went back down and they had to bid, we're not saying you should order them to suddenly say, yes or no, they exist or they don't exist. That probably isn't appropriate. Probably what would be more appropriate is if you looked at this affidavit, and there have been courts that have looked at other affidavits and said this is just not enough. That's all. It's just not enough. It would go back down, and they would be required to provide a more detailed declaration. And in fact- What would be the authority for doing that? I mean, I'm reading Mr. Pike, no, Mr. Barlow, excuse me. He is the primary- Authority. GA person. Right. He's director of acquisitions, which I guess means director of being able to direct how they acquire this data. And he explains the situation. So I'm trying to understand the relief that you want. You're saying, oh, we should say this is not specific enough? Well, that's, I mean, the Hunt case, all the cases in this circuit, the cases in the D.C. circuit, they all talk about the need for a sufficiently clear declaration that allows the court to make a reasonable conclusion that the asserted exemption is correct. This affidavit that he provided, it's a cookie cutter. It doesn't have anything to do with this case. They could provide that declaration in every single case, every single time they get it for you. So one resolution of this case, I mean, if you read it and you go, this doesn't really allow me, I realize, I give you all the deference in the world, this declaration, like in the Church of Scientology case where the D.C. circuit said that an NSA declaration was not sufficiently detailed, well, they reminded it for a more detailed declaration. And even then, that's not the end of the story, because let's say it goes back out, just theoretically. And let's say that they provide a more detailed declaration. And let's say the court looks at that based on your instructions. The court says, this still isn't quite detailed enough to satisfy me. They can then do what the CIA does all the time, and it's in all these cases. It happened in the previous cases that were addressed here in the Ninth Circuit. In fact, it happened in the Glomar case itself in the D.C. circuit. They can provide. Let me pause it here, what you're talking about. He says in his declaration that there's situations where you would send in a FOIA request, and they would turn it over, and there would be specific targeted things you might want, and they would look and see if they have those. But this is a little bit different, because then he goes on to say that the breadth and scope of how they run their satellite data, and whether they do or don't in different locations, that's what's classified, and that's different than if you wanted other data. That's true, but that's also, we're just not there yet. This is just about, will you concede, can you concede that the data exists or doesn't exist. One could then, and what the courts do routinely, the courts did this in the Glomar case, the whole case that this all relies upon. The court did this in the Hunt case, which is the first Ninth Circuit case. You want them to say that we have satellite data on the MiGs in Cuba, and that date and that location. Not even Cuba. It's in international waters. But on that date, we either do or don't. In the vicinity. We either do or don't. In the vicinity, we have it. Right. We either do or don't have it. We have it. So you want them to say that, and then you want to go back. And they could submit that in camera. In other words, they could submit a more public, a more detailed public declaration, or if that doesn't work, they could submit an in-camera declaration to the court to convince the court. I mean, the other thing that's important here. You can't tell the court, okay, no, we don't have it, so that's game over. But, yes, we do have it. We can't tell these guys we have it, because that's the whole thing. They could tell the court in camera. They could tell the court in camera. But what would they tell the court differently than what they've told here, other than to say we do or don't have it? We do have it. And here's why confirming that we have it would be a big problem for us. Because, look, we don't know. We don't know. Let's say they don't have it. We don't know. It could be a billion reasons. I could spend 12 hours explaining to you all the reasons why they may not have it. Just the satellite wasn't working that day. We didn't have a satellite in that part of the world today. We didn't care about that part of the world. There were cloud covers. There was a storm. Who knows why? Our guy was asleep at the wheel. It could be 100 reasons why they don't have it. But let's say they do have it. We have no idea if they have it, because they were looking at everything, whatever it is. I think it's 1,456 miles from the North Pole to there. Maybe they were doing all that. Maybe they were doing all of the Caribbean. Maybe they were doing Miami, and they captured part of this. Maybe they were doing Cuba, and they captured part of this. Maybe they were doing the whole Atlantic Ocean. So we, the fact, and then they also argue that it would show an interest in Cuba. I mean, that's, I mean, the United States has a, I mean, that would be like the CIA saying, this would show that we had an interest in the Soviet Union. Well, everybody in the world knows that the CIA had an interest in the Soviet Union. This is not a situation where we're arguing about a method of intelligence where the CIA has some way to gather evidence that we're not generally aware of. This is sort of a strange agency that has a website that goes on and on and on and publishes a glossy magazine, and that goes on and on and on about how fantastic their satellite capabilities are. This is an agency that says when there was an earthquake in Haiti, whenever it was, a couple of years ago, we not only, and they brag about this, we not only had the capacity of telling what happened, we had the capacity that we could tell first responders where to land their helicopters and the best way to hike, the best way to hike to where there was a problem and whether they would encounter mud along the way. I mean, this is an agency unlike the CIA that literally brags about and makes very public its capabilities. And in light of that, you've really got to ask yourself logically, just saying whether or not you have an image of a particular piece of the ocean on a particular day, how is that going to help human intelligence? Mr. Shea, this is all really interesting, but at the bottom we have a statute. We do. It's not a well-drafted statute. That's a problem we encounter quite frequently. That's true. But the reality is, if you look at this from a common sense perspective, unlike you, I don't view this Barlow Declaration as being cookie cutter. He specifically said, you want it under this section, this is why we're not going to give it to you. You want it under this other section, this is why we're not going to give it to you. It may be your problem, you need to go to Congress and get something more specific, because at least based upon the language of the statute, the response is a fairly reasonable one, and we as a court know that traditionally when it comes to matters of potential national security and intelligence we need to, unless there's a clear direction to the contrary by the Congress or the Supreme Court, we have to be a little careful what we do here, because it's not our area of expertise. Whatever our area of expertise may be, it's not that. So as interesting as your argument is, I don't see how we can really help you here. I really don't. There's no case law you can refer us to that gets us there. The Supreme Court's been very careful, even upheld these even broader exemptions for government secrets and so on, that you can't even get started in the case, let alone get as far as you have in the current climate. So I don't, I mean I'd love to have something, you can give me a crowbar where we can go look at this, but I don't see it. Let me try a small crowbar. Okay. And I agree. Look, we don't disagree. This is an area in which the agencies are entitled to enormous deference. It's an agency that involves national security, the apex of the concerns of the federal government, this court. So all of that we fully understand. Certainly one of the crowbars that we raised in our brief, and to the extent we have to take Congress at its word with regards to its use of Exemption 3, which seems to be the main thing that the district court relies on, that exemption clearly says that it's up to the Director of National Intelligence to exercise that exemption. It's an exemption given to the Director of National Intelligence. The Director of National Intelligence has a big office. They also have a website. And by the way, they don't do what the NGA does. You can go read all kinds of cases involving the Office of the Director of National Intelligence. In fact, their homepage talks about how they've just released this and they've just released that. So here the statute says that it's the Director of National Intelligence that is supposed to exercise this to protect the intelligence sources. So we say, hey, they didn't do that. Well, they respond by saying, oh, my gosh, you know, Congress couldn't have possibly meant that the Director of National Intelligence get personally involved in every single Freedom of Information Act request that's submitted to every intelligence agent. Well, number one, they don't have to rely on that exemption. But they do rely on it. And it's the main exemption the district court relies upon. But the plain text of that statute clearly requires some showing that the DNI authorized a federal agency such as the NGA to assert the exemption that under his authority he is granted under section, under 102A11 of the National Security Act. So that is something that's not just, we're not just willy-nilly running over Congress. We're saying, hey, if they want to assert an exemption three, which pulls in section 102A11 of the National Security Act, then they need to go to the DNI. Maybe the DNI make a different decision. Maybe the DNI would look at this case and say it's not that significant. We don't mind releasing these images. We don't know that. Me too. Thank you. Thank you. We'll hear from the government. May it please the Court, I'm Thomas Byron from the Justice Department here on behalf of the defendant, the NGA. The district court in this case explained in great detail why exemptions one and three of the FOIA both authorize the GLOMAR response in this circumstance. And I'd like to clarify one thing. Opposing counsel said that NGA has taken the position it would always assert a GLOMAR response in response to FOIA requests. That's not true. And I think the Barlow Declaration makes that clear, that there may be circumstances where a particular FOIA request would not reveal sources and methods, for example, and therefore would not implicate the concerns that we're talking about in this case. But here, the request is for images or reports or other documents about images of a particular location on a particular date concerning a particular subject matter. And the Barlow Declaration explained that identifying whether or not the agency has those records, confirming or denying that, in other words, would itself reveal sources and methods of intelligence because it would identify to our adversaries the reach, the limitations, the capabilities and limitations of our technological ability as well as our interests and focus. I don't get it. The agency's mission is to take pictures from space, right? That is the biggest. So that's given, that's known. I should say, Chief Judge Kaczynski, it's a little bit more nuanced than that, and I'm not an expert in it, but they've made the point that what they do actually is not take the pictures, but they analyze the images. So they analyze images from a variety of satellite sources, not just intelligence satellites, which are the ones at issue in this case, but also sometimes from commercial satellites. So they take pictures and analyze more pictures, the ones they take and the ones that they get from anywhere else, right? Right. You know, that's known. And I'm not sure how saying yes, we have a picture of a particular point in time and space reveals anything at all. Well, let me see if I can explain it a little bit more clearly. There's never been a suggestion, certainly the government has never said, that the NGA has the capability to take a picture of any place at any time with a particular resolution. No, we have said that there have been certain incidents that we've been able to bring our resources to bear that have proved helpful to the United States and to our partners. But that's a very different point than I think the premise of plaintiff's argument, which is you must have satellite pictures. You must have the capability, at least, of having satellite pictures of everything, right? First of all, that's not true. The Barlow Declaration explains every intelligence service has limitations of resources. And those limitations are very important, not just to us, but also to our adversaries, who are constantly seeking out the ability to identify what those limitations are. So we have a limited number of satellites. They can't all be every place at the same time. People actually track those satellites, people in foreign countries, people who are interested in identifying those capabilities and limitations. And if we say we have a picture of a certain place at a certain date at a certain time, somebody could say, well, we've been tracking your satellites. We know where they were at that time on that date. We know, then, that the angle that that picture must have been taken reveals a certain capability, that the lens allows resolution, presumably, of the relevant information, from one point in the sky to a point on the land at a particular angle. But I thought you just told us that they don't rely just on their own pictures. They get pictures from other places as well. That's right. There's no way of telling whether a picture comes from an intelligence satellite or one of these collateral sources. Well, let me clarify here. You can't tell whether the absence of a picture is because of cloud cover or lack of interest, right? Sure. And let me make a couple of points in response to that, Chief Justice Kuczynski. One is that, in this case, the request was interpreted and understood by both parties, and the district court clarified this in, I think, footnote 29 of the opinion, only to refer to intelligence satellite imagery, not to the commercial imagery that's licensed but not retained. The agency made clear that it doesn't search for commercial satellite imagery because it doesn't retain that information. It has it under license. It analyzes it, but it doesn't keep those images in its files. That's all in the district court opinion, by the way, in that footnote. Second point is that the real concern here is as much a question of targeting and interest of the federal government. Now, it's one thing, of course, I think jocularly to say that it's undisputed that the United States has an interest in Cuba. Of course, everybody knows that, but that's not the question. The question is whether the United States intelligence community, and NGA in particular, exercised its technological capabilities and resources on a particular date about a particular incident and has information in its files about that date, place, and time and subject matter. Those targeting decisions, those questions about the interest of the intelligence community have been recognized in lots of cases, including those about the NSA. It's awfully broad. You can say it about any point, any time. You said the Barrow Declaration doesn't say you would, but the fact is the Barrow Declaration makes it clear that you could. Anything we do, you can't have. We can give a gloom of responses to anything we do because saying yes or no reveals something about what our thinking is. Well, any request that asks for images on a particular date, time, and place, in other words, would raise the same concerns about revealing intelligence sources and methods. So that's true, Your Honor. This is just a lawyer's way of saying yes. I asked you a question. What was the question, Chief Judge? You didn't listen the first time. You didn't listen the second time. Let me give you the third time. This is an argument that can be made any time anybody asks anything about what this agency is doing. I disagree, Chief Judge. Tell me why not. What I just tried to clarify is that we need to focus on the particular kind of FOIA request that was made here, and that was a request not for anything the agency does, but for whether the agency has in its records images. There's never a request for anything the agency does. It's always going to be a request for a specific place and time. I mean, all it does is pictures, right? Well, no, Your Honor, what they do is analyze images. Let's put away the analysis. Let's just look at the photographs. I understand the analysis can reveal a lot, and let's put that aside. But any request for pictures, you could say, telling you whether or not we took a picture on that day from that particular piece of earth tells you something about our capabilities and thinking. Yes, Chief Judge, and I don't think that's extraordinary in any way after all. It's just a yes to my question. The answer is any time they take a picture or have not taken a picture, any time anybody asks something of the agency concerning pictures, they can say, well, I'm going to tell you because telling you whether we took a picture or didn't take a picture, revealing the picture, not revealing the picture, gives away something, our sources, right? So this is an argument that applies to everything the agency does. I mean, I'm putting it aside. I have to disagree a little bit, Chief Judge, because it's not everything the agency does, but only FOIA requests that ask for whether there is an image about a particular place, date, and time. And so that is different than the question you're asking, which is everything the agency does. That's the quibble that I have to return to you on. But the fact of the matter is that because you could piece it all together, if you had thousands of these, I guess the agency's position is we're not going to tell you anything. Right, Judge McHenry. We expect whether we have a photo or imagery of any particular place or any particular time. Now, we might tell you who works here. Right, exactly, Your Honor. But basically, in terms of what you're really doing, you're saying we're not going to tell you anything. Well, Your Honor, what we're not going to tell you about is our sources and methods of intelligence. And that's because Congress Tell me your sources, you just have to tell me. I want to know, do you have any pictures of this incident on this date? And your answer is we're not going to tell you that, not only this time, but any time. Exactly, Your Honor. And the reason that's an important consideration is that the FOIA requires us. You don't need to keep talking. That answers my question. The question was, this is something that covers everything. Right? So I don't know why you're so hesitant to admit it, but that's really what it is. It's a huge exemption that you're claiming. It's not like saying we're asking about something that might reveal the identity of a particular agent in Afghanistan. This is something that says, if we do it, if we take a picture anywhere, or we haven't taken a picture anywhere, we're not going to tell you about it. That's as broad an exemption as you're claiming. I think that is a broad exemption, as this Court recognized in the Neer and Hines. What's wrong with yes? That's what you're claiming, right? I have said yes, Your Honor, and I'll say it again, yes. This statute protects. So it strikes me as a giant step past past cases to have an exemption that's quite that broad. I disagree, Your Honor. Look, for example, at Muneer and Hunt, in which this Court criticized the Supreme Court's decision in Sims, or at least the implications of that opinion, and said that it amounted to a near total exemption for the CIA as a whole. One can quibble about whether that's accurate or not, but the fact is this Court has long held that the National Security Act's protection of sources and methods of intelligence is itself a very broad subject matter. And that FOIA's reference to such statutes in Exemption 3, therefore, requires a very broad protection of that intelligence subject matter when faced with a FOIA request. And you can't look at a FOIA request in isolation. The case law is equally clear. It's a lot more plausible to believe that when the agency has agents on the ground that might get killed or compromised or something of that sort. When you've got satellites in the sky, it's a lot harder to justify. Oh, I disagree strongly, Your Honor. It's your job to disagree. Well, it's my job on behalf of the government to explain that sources and methods referred to in the National Security Act is, as this Court emphasized, a very broad term. It includes not just human sources, but also technological capabilities. Indeed, any statutorily authorized, any method... Even to say we have a picture? I'm sorry, Your Honor? No, not even to provide the picture. Even to say we have a picture, not to give the resolution, not to actually provide the picture, not to show the angle, even just to say, yes, we have a picture, or no, we don't have a picture? Yes, because saying we have a picture would allow our adversaries to identify those technological capabilities and limitations by knowing where the satellite was in the sky that day. How would you know what angle the picture is at? Because, as I explained earlier, our adversaries track those resource limitations. They keep track of our satellites, and they want to find out what they're able to do and what they cannot do. And by knowing whether we have photos... Explain it to me slowly. Okay, so they know where the satellite is. Yes, Your Honor. Okay, and they know the location that's being asked for. So they know the satellite's over here, on this particular date and time, because they tracked it, right? Yes, Your Honor. And they know this particular piece of earth. Okay, and how does information... Yes, we did take a picture while in this location. No, we didn't take a picture. How does that reveal anything? Because the angle from the satellite... But I'm not saying you would see the angle. You would not know the angle, because you would only say we have a picture. You wouldn't know whether the picture is like this, or the picture is like this. Well, Chief Justice Kaczynski, the hypothetical you posited, and it proceeds from what I've been explaining, is that we know where the satellite was in the sky. We know where the subject of the photograph was. By knowing those two locations, it's a matter of simple geometry to identify the angle from which it was taken. That's our point. The reach of a satellite, how far away can it take a picture at a meaningful resolution? We don't even have to say what the resolution was, but for the resolution to be relevant to the agency's intelligence interests, how far away does that have to be? You know where the satellite was, how far away was it? If it was a certain number of thousands of miles, then you know it has a particular reach. If it was farther away, and we don't have one, then you can think that it doesn't. So the satellite is at a particular distance, but what if those satellites are right overhead? Yes, Your Honor, what if they were? And if we don't have a picture, then what does that inform our adversaries of? We might have had cloud cover. We might not have had an interest. Right. Look, I acknowledge, of course, that the Glomar response is one that leaves a lot of doubt. A Vaughn index, one that identifies whether we're confirming or denying whether we have particular records, and what those records are, after all, it has to be reasonably detailed, would provide some of those answers, but maybe not all. So some doubt would still be left. The protection of the National Security Act, incorporated in FOIA's Exemption 3, is not just to eliminate some but not all doubt. It is to protect sources and methods very broadly. Why not have an in-camera review with more texture and nuance so that the court could determine whether it was like this, or whether, in fact, there was a good-faith concerted effort to figure out if there was truly a national security interest? Judge McKeon, first of all, let me explain. We did offer to the district court, at the oral argument on the summary judgment hearing, to provide more detail in an in-camera classified declaration. The district court concluded that was not necessary. We think that recognition was required. Why shouldn't we reverse that? If this court, first of all, Your Honor, is interested in more detail at a classified level, we will repeat that same offer. And if the FOIA provides for in-camera review of the record. Well, I'm not interested in seeing the pictures. I'm in trouble enough about the fact that you can see my house on Google Maps. If you look up close enough, you might see me sunbathing on the patio. You have to fight your way through the paparazzi, though. That's right. But there's a big difference between saying, look, the answer to everything is, we're not providing any information, it's a black box. And the answer is, you can justify it to the district court. And I can imagine in certain circumstances there would be no doubt having a picture would reveal no information at all because you have a satellite right overhead. I disagree, Your Honor. Again, this goes to the mosaic point that every piece of information has to be considered in light of the expertise of our adversaries' intelligence community who themselves spend their entire time and a great deal of resources trying to figure out what we know, what we can do, what we can't do, and what our interests are. So the very point here is that if the answer is that plaintiff gets this information in this case, then it has to also be that every foreign intelligence agency can ask for and receive any details they want about whether we have those pictures. Now, any one answer – It's a practical matter, though, in terms of what's going to happen here. Either we determine – to me, there's three options. One is straight affirmance. This is enough. Mr. Pike's declaration is enough. Mr. Barlow, please. Mr. Barlow. Excuse me, Pike, because they're experts. Second, we could say under the various standards under which we review FOIA that on the de novo standard, whether there's enough to make a full decision that there isn't, and therefore we would need this in camera or more detailed. Right. Or I suppose a third option would be just reverse the burden and therefore turn it over, whatever. I mean, there may be other options. But those seem to be the range of options that we would have here, and if I hear you, you wouldn't really have an objection to option number two, which is there doesn't seem to be quite enough here from Mr. Barlow and that the district court to make a more informed decision might need more detail. Well, Judge McKeon, let me clarify one thing. Okay. Well, two things, actually. First of all, option three is not an option. We're not aware of any instance in which a court has been upheld for ordering disclosure of classified information. That's not on the table. And I think plaintiffs actually, counsel at argument made that clear. They're not asking for that. So the question really is about whether the Barlow Declaration adequately, in other words plausibly and logically in the terms of the case law, explains that disclosing this information would either reveal classified information or would reveal sources and methods protected by the statute. We think it does. If this court disagrees, of course, remand is always an option. We don't think it's necessary here. Going back to the question about in-camera submission, that's authorized, but the case law also makes clear that it's a last resort and that normally the presumption of our constitutional system, our judicial system, is that it will be done in open court whenever possible. And so here, what we did was we tried to make clear, make sure that we provided as much information as we could on the public record. And we offered to the district court that if there was any uncertainty, we could make an additional classified in-camera declaration to address any questions the court might have about that. The court said it wasn't necessary because in light of the deference that's due to the expertise of the intelligence expert here, this plausibly and logically explains that it's within Exemptions 1 and 3. And I'd be happy to address, if the court has any questions, the argument that Plaintiff's Counsel made at the end today, I see my time has expired, about the Director of National Intelligence's personal involvement. This is a point that has... I don't think that's necessary. Thank you, Your Honor. We rest on our briefs and we urge the court to affirm. Thank you. Can I just argue with Sam Smith?
judges: Kozinski, McKeown, Smith